The **FIRST NATIONAL BANK OF LANSDALE, Executor of the Will of Irwin H. Pool, Deceased, Lansdale, Pennsylvania, Plaintiff,**

v.

**Francis R. SMITH, Collector of Internal Revenue, Defendant (two cases).**

Civ. A. Nos. 13825, 13826.

United States District Court
E. D. Pennsylvania.
May 29, 1956.

Sidney L. Wickenhaver, Philadelphia, Pa., Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., of counsel, for plaintiff.

W. Wilson White, U. S. Atty., Philadelphia, Pa., Charles K. Rice, Acting Asst. Atty. Gen., Andrew D. Sharpe, John J. Sexton, Jr., Attorneys, Dept. of Justice, Washington, D. C., for defendants.

CLARY, District Judge.

Two suits were instituted by plaintiff, The First National Bank of Lansdale, as executor under the will of Irwin H. Pool, deceased, to recover an alleged overpayment of income taxes by plaintiff's decedent. The first case, Civil Action No. 13825, was brought against Francis R. Smith, Collector of Internal Revenue, in order to preserve plaintiff's right to a jury trial. The second case, Civil Action No. 13826, was brought against the United States of America. Since identical questions of law and fact were involved in each action, the two cases, by

agreement of counsel, were consolidated for trial.

Beginning January 13, 1956, Civil Action No. 13825 was tried to a jury. It was stipulated that the testimony in the first action against Smith might be considered by the Court in deciding the second action against the United States. On January 17, 1956, after a special verdict by the jury in Civil Action No. 13825, the Court entered judgment in that case in favor of the plaintiff in the sum of $11,862.51, plus interest as allowed by law, and costs. On January 27, 1956, defendant filed a timely motion to vacate the judgment and to enter judgment for the defendant. Because of the identical factual situations involved, the Court heard argument at the same time on defendant's motion as well as on proposed findings of fact and conclusions of law in Civil Action No. 13826.

The principal question presented in each case is whether the deceased taxpayer, Irwin H. Pool, incurred a loss proximately related to his trade or business which could be deducted in 1945 under Sections 23(e) (1) and 23(k) (1) of the Internal Revenue Code of 1939, Title 26 U.S.C., and which could be carried forward to 1946 and 1947 under the net operating loss provisions of Section 122 of the Internal Revenue Code of 1939, Title 26 U.S.C., because he was unable to recover funds which he had furnished to a corporation of which he was a director, officer and shareholder.

The record discloses that until his death in 1948 the deceased taxpayer, Irwin H. Pool, a lifelong resident of Lansdale, Pennsylvania, was engaged in the pants manufacturing business. Pool was also active in the social and religious life of his community. That he was a generous person with a high degree of civic consciousness and responsibility clearly appears from the evidence. As president of Pool & Sons, he devoted considerable time, effort and energy to the business. A man of financial substance, he was also active in organizing small local finance companies to improve credit conditions in small communities outside of the metropolitan area. Actually, he was a promoter of these credit facilities. The record indicates that from time to time he personally made loans to various individuals for educational purposes as well as for business, but the record does not support a finding that he was in the money lending business. Many of his loans were never repaid or such a small portion of a loan would be repaid that the conclusion is inescapable that his prime object was help to his fellow man rather than to profit by his money lending activities.

The controversy between the Commissioner of Internal Revenue and the taxpayer stems from Pool's activities with Motorfrigerator Company, a Lansdale enterprise. This company owned a vital patent in the field of air conditioning and refrigeration, granted in 1928 (U.S.Patent 1,673,082). Until this patent was issued, every mechanical refrigerator had to have what was known as a "drip pan" under it. By use of this patent it was possible to avoid the use of a drip pan by internal absorption of moisture and it is now in use as standard equipment on every mechanical refrigerator and air conditioning unit in the United States. The company was not very successful in its manufacturing attempts and determined that it would retire from the manufacturing business. It attempted to make licensing arrangements with all mechanical refrigerator manufacturers, but it had no funds with which to operate. To police the industry for infringers, to start lawsuits for infringement, to make settlements with infringers, and to conclude licensing arrangements required substantial capital. Accordingly, the company approached three men of substance and asked them to contribute funds for the above stated purposes and to expend their services, time and financial assistance in behalf of the company in return for which they were to receive 25% of any profits made on the patent. These three gentlemen, Irwin H. Pool, James M. C. Speirs and D. M. Feldman, had very minor holdings in

the stock of the company and never increased their holdings but, since the proposition advanced by the company appealed to them, they agreed to enter into the project. An Executive Committee composed of Pool, Speirs and Feldman was placed in charge of the company's activities on what was clearly a joint venture agreement. Operations started on the project in the year 1931. On December 12, 1933, the stockholders of the company at a special meeting unanimously adopted a resolution which ratified the arrangement with the Committee, which resolution read as follows:

"Whereas, the stockholders of the Motorfrigerator Company, are greatly indebted to the Committee appointed to handle the affairs of the Company with reference to litigation against General Motors Corporation and any other corporation, firm or individuals which may be infringing certain patents now owned by Motorfrigerator Corporation, in that the members of said Committee and other Directors named herein have advanced their personal funds and have given largely of their time and will, in the future, advance further personal funds for other litigation, in connection with infringements of patents held by said Motorfrigerator Corporation; Now, Therefore, be it resolved by the Stockholders of the Motorfrigerator Company that said Committee, consisting of J. M. C. Speirs, Irvin H. Pool and D. M. Feldman and the following Directors, LeRoy R. Wismer and the Estate of Henry L. S. Ruth, who have served on said Committee and/or have advanced their personal funds in connection with said litigation, shall receive for their services 25% of any actual recovery in connection with any litigation brought for infringement of any patents owned by said Motorfrigerator Company, after all charges and bills have been paid, and the Board of Directors is hereby authorized to so com-

pensate the above mentioned Directors for their services."

While five persons were named in the resolution, only Pool, Speirs and Feldman functioned as active members of the Committee.

The evidence clearly shows that the Committee's activities consumed a substantial portion of Pool's time from 1931 to 1945. The Committee met at least once a week for several hours on Fridays and many Sundays. As treasurer of the Committee, Pool was entrusted with the responsibility for disbursements, receipts and keeping the financial records. From his personal funds between 1931 and through 1944 Pool advanced to the company $55,385. Similar advances were made by Speirs and Feldman; Pool, however, being the largest contributor. In 1940 General Motors offered Motorfrigerator Company, through the Committee, the sum of $750,000 for the purchase of the patent. Since it was a unique patent, the Committee felt that the offer was inadequate and that a higher price should be obtained for it. Among those with which license agreements were concluded were General Electric Company, Chrysler Corporation, Carrier Corporation, Westinghouse Electric, General Motors, York Ice Machine, Certified Products Corporation and others. The Committee employed a patent attorney and a qualified investigator with sufficient technical knowledge to represent the company before the Patent Office in Washington and in litigation.

It is a matter of common knowledge that the onset of World War II, in effect, terminated the production of refrigerators and air conditioners. Refrigerator manufacturers lost interest in any licensing agreements as well as the purchase of the patent. None of the advances made by any of the three Committee members were ever repaid and Pool sustained a total loss of his entire contribution of $55,385. Pool died on April 17, 1948, and plaintiff herein duly qualified as Executor under his will. There is no dispute that plaintiff's decedent timely

filed, and paid, his income tax returns for the years involved, and a stipulation of facts discloses that claims for refund for all tax years involved were timely filed, which claims were subsequently disallowed by the Commissioner of Internal Revenue. These suits followed.

The Internal Revenue Commissioner in refusing to allow the deduction of the loss of $55,385 took the position that the loss was not incurred in trade or business; that with respect to his activities in connection with Motorfrigerator, Pool was not in an individual business but was really acting for the corporation as an officer and agent of the corporation; that the advances were actually loans by him to the corporation; that the loans became worthless in some year and that this resulted in the creation of a bad debt.

The Commissioner also took the position that at best this venture could be called only a transaction entered into for profit and that the rule covering deductions for nonbusiness debts, 26 U.S. C. § 23(k) (4) applied, which provides that such losses should be considered as "a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months", a situation without the provisions of the carry-back sections of the Internal Revenue Code. Further, the Commissioner ruled that the loss was incurred in a year other than the year 1945, as claimed by plaintiff.

It would unduly prolong this opinion if the Court were to review in detail the testimony of all of the witnesses in the case. Mr. Feldman, one of the Committee of Motorfrigerator Company, testified in full detail as to the operations of the Committee. LeRoy R. Wismer, factory superintendent and former secretary of Motorfrigerator Company, testified as to the corporate documents. Hiram K. Gottshall, accountant associated with Charles S. Rockey & Company, certified public accountants and Pool's accounting advisor for many years, testified as to the activities of Pool with Motorfrigerator Company, as did his private secretary of many years, Mrs. S. Alice Horner.

Briefly, the record discloses that Pool made the stipulated advances, that he devoted considerable of his time, effort and energy to Motorfrigerator Company, and that his activities in connection with it were with the idea and expectation of making a profit. The patent was scheduled to expire in 1945 and the last transaction in connection with the patent, as shown on the books of the company, also occurred in 1945. The question, therefore, as to when the loss was incurred became peculiarly one of fact to be determined by the jury under appropriate instructions by the trial Judge. Extensive requests for charge were filed by each counsel and, it being a tax case and rather technical, it was decided that special interrogatories should be submitted to the jury. Five proposed interrogatories were submitted by respective counsel and the form thereof approved by the Court. The questions propounded by the Court to the jury, as approved, and the answers thereto are as follows:

Q. "1. In what year was the loss on the advances of Irwin H. Pool to the Motorfrigerator Company incurred?"

A. "1945".

Q. "2. Was the loss on the advances of Irwin H. Pool to the Motorfrigerator Company incurred in a business regularly carried on by Irwin H. Pool? Answer 'yes' or 'no'."

A. "Yes".

Q. "3. Was the loss on the advances of Irwin H. Pool to the Motorfrigerator Company incurred as the result of a bad debt? Answer 'yes' or 'no'."

A. "No".

Q. "4. If your answer to the second question is 'yes' and your answer to the third question is also 'yes', was Irwin H. Pool regularly carrying on such business in the year in which the loss was incurred? Answer 'yes' or 'no'. * * *" (If your answer to either the second question or the third question is

"no", you need not answer this question.)

Q. "5. If your answer to the second question is 'no' and your answer to the third question is 'no', was the loss on the advances by Irwin H. Pool to the Motorfrigerator Company incurred in a transaction entered into for profit, although not connected with the trade or business of Irwin H. Pool? Answer 'yes' or 'no'. * * *" (If your answer to either the second or third question is "yes", you need not answer this question.)

Counsel for both parties agreed (1) that if the loss on the advances of Irwin H. Pool to the Motorfrigerator Company incurred in 1945; (2) that if the loss on the advances was incurred in a business regularly carried on by Irwin H. Pool, and (3) that if the loss on the advances of Irwin H. Pool to the Motorfrigerator Company incurred was not the result of a bad debt, under Section 23(e) (1) and Section 23(k) (1) of the Internal Revenue Code, plaintiff in Civil Action No. 13826 would be entitled to recover the sum of $4,712.79, plus interest as allowed by law, together with costs.

■■ The Government's position, as stated at the trial and in its brief in support of its present motion, was that the jury's finding that the loss to the taxpayer was incurred in 1945 is without support in the record and should be set aside. The Government's contention that the loss was suffered in some year prior to 1945, either in 1943 or 1944, it argues is supported by the evidence introduced of expenditures and receipts, with receipts diminishing to $50.30 in the year 1945 and expenses of $52 for that year. It asks the Court to determine as a matter of law that there was no hope on the part of Pool to recover any of his loss. The position of the Commissioner of Internal Revenue in that regard is thoroughly understandable. As the Administrative Officer charged with making a finding which would be reflected in taxes due and owing the United States, it is certainly not unreasonable that he should arrive at the conclusion that the loss was incurred either in 1943 or 1944. But this is a matter upon which men of sincere disposition with a view of arriving at the true fact might reasonably differ. As stated previously, the patent in question was a unique one. It is true that Pool, Speirs and Feldman, as astute businessmen, might well have realized in earlier years that their chances of recoupment were growing slim, but the law respecting tax deductions is that the year in which the loss is incurred is the year in which there is no hope of recovering anything. Bell v. United States, D.C.M.D. Pa., 120 F.Supp. 931, affirmed per curiam 3 Cir., 1954, 217 F.2d 646. That the Committee and Pool might reasonably have hoped to get some substantial return from the sale of the patent, even in 1945, is a question which the jury might carefully consider in its deliberations as to the year in which the loss actually incurred. The jury chose to accept the contention of the plaintiff under the applicable law covering this particular feature, as charged by the Court and to which no exception was taken by the Government, and, since this is a matter upon which reasonable men of sincere purpose might differ, the Court feels that the finding of the jury in that regard should not be disturbed. The Court will also adopt the jury's finding as to that fact as a finding of an advisory jury, under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., in the non-jury case.

■ The second problem involved in this case is more elusive and more difficult of ascertainment. The difficulty stems from the failure of Congress in the Internal Revenue Code to define exactly what constitutes a "trade or business" within the ambit of the Internal Revenue code. The Government argues cogently that Pool, as an individual and as a member of the Committee, could not have been engaged in a joint venture with Motorfrigerator Company and that all of his activities were as an officer and agent of the company itself. This was the position taken by the Commissioner

and certainly no criticism can be directed at his contention. However, this is also a matter upon which reasonable men of sincere purpose might likewise differ in arriving at a decision of whether Pool in this particular aspect, which covered some fifteen years of his life, was actually engaged in a "trade or business". The Government does not contend that this was just an incidental matter with which Pool had some brief connection. The record is clear, as previously stated, that he devoted much of his time, energy, effort, talent and money to the advancement of the enterprise. From all the evidence the Court clearly gathered the impression that in acting as he did, Pool was acting as a joint venturer in a business undertaking designed to return substantial profits to him. A reading of the cases which involve the construction of the term "trade or business" discloses as a general proposition of law that it is a question of fact to be determined by the surrounding circumstances of each case as to whether the taxpayer involved is engaged in a particular "trade or business"; Higgins v. Commissioner, 1941, 312 U.S. 212, 217, 61 S.Ct. 475, 85 L.Ed. 783; Commissioner of Internal Revenue v. Stokes' Estate, 3 Cir., 1953, 200 F.2d 637. The general rule is that the term "trade or business", as used in the Internal Revenue Code in the section involved in this case as well as other sections, bears a restricted meaning which does not include every activity of an individual engaged in for livelihood or profit. Commissioner of Internal Revenue v. Smith, 2 Cir., 203 F.2d 310. Isolated or occasional transactions do not constitute a business, but varied, continuous and regular activities by a taxpayer in a business venture in which he is not only financially interested but to which he devotes a substantial part of his time may make such a venture a business; Kuhn v. Thompson, D.C.E.D.Ark., decided November 13, 1953 (1954 Prentice Hall, par. 72,358).

Viewing the case in the light of the applicable legal principles, what is the evidence? The undertaking by Pool and his two associates carried with it the prospect of substantial profits. There is no question that had the offer of $750,000 been accepted for the patent, Pool and his associates would have profited handsomely. That Pool devoted substantial time, effort and energy to the management of the affairs of the Committee from 1931 to 1945, inclusive, a period of fifteeen years, is convincingly established by the evidence. The Committee met at least weekly and sometimes more frequently, for several hours, over the entire fifteen year period, to supervise the exploitation of a valid and valuable patent in which the members had a very substantial interest. We do not have here a case in which a taxpayer has made only a single advance or isolated advances to a business generally carried on by others. Pool made continuing advances over a long period of time and during that entire period devoted substantial time and energy as well as money to the venture. In undertaking to carry out the terms of the resolution of Motorfrigerator Company, above quoted, the jury might well have considered that Pool had in fact obligated himself to advance the money required and may well have felt that this was a substantial reason why this particular venture should be considered as a trade or business of the deceased taxpayer. See Spencer v. Maloney, D.C.D.Or.1947, 73 F.Supp. 657, affirmed 9 Cir., 1949, 172 F.2d 638. I know of no rule which provides that any officer is *obligated* to make advances to a corporation in which he is interested. That Pool felt he had an obligation so to do under the resolution of the Motorfrigerator Company is likewise crystal clear from the evidence.

Under all of the facts and circumstances can it be said that sufficient evidence has been produced to overcome the presumptively correct determination of the Commissioner that Pool was not so engaged. I think that there has and the jury having made its determination, the Court will adopt its finding as that of an advisory jury, under Rule 52(a) of the Federal Rules of Civil Procedure, in the non-jury case.

The final question decided by the jury was whether the loss on the advances of Irwin H. Pool to the Motorfrigerator Company incurred as the result of a bad debt. The Government strenuously argues that the only business being conducted was that of the corporation itself, that as an officer and director of the corporation Pool made advances for the account of the corporation, and that there was a mere creation of a creditor-debtor relationship. This contention, if sustained by the evidence, would result merely in the creation of a bad debt when loss was inevitable or collection of the debt impossible. But the facts as found by the jury do not bear out this contention. The key to the entire case is the resolution adopted by the stockholders of the company in 1933. Even if, as contended by the Government, the resolution is slightly ambiguous as to whether or not the advances were to be repaid to the investors before distribution of profits, the actions of the Committee under the resolution clearly demonstrated to the Court that these three men were individually engaged in a joint venture with the corporation for profit. It is hardly conceivable that had there been a substantial profit, the advancements (charges) would not have been a first charge on the fund. The evidence establishes that the division of the 25% profit was to be in exact accord with the proportionate investment of each of the three investors in the project. From all the surrounding facts and circumstances it was for the jury to say whether these advances to the corporation were in the nature of loans. From all of the evidence the Court was of the opinion that it was never the intention of any of the Committee to make loans to the company, as such. That the method of operation *might* create a contrary impression is in the entire aspect of the case not controlling. The jury reached the same conclusion that the trial Judge would have and, therefore, I will adopt the finding of the jury in that regard as the Finding of the Court in the non-jury case. It follows, therefore, that under the stipulation entered into between the Government and the taxpayer, the taxpayer is entitled to recover the amount agreed upon.

For the reasons set forth above, an order will be entered dismissing defendant's motion to vacate the judgment and to enter judgment in its favor in Civil Action No. 13825, and for judgment in the stipulated amount in favor of the plaintiff in Civil Action No. 13826.