Lynn A. Smith and Mary McK. Smith v. Commissioner.
Smith v. Commissioner
Docket No. 75315.
United States Tax Court
T.C. Memo 1961-91; 1961 Tax Ct. Memo LEXIS 246; 20 T.C.M. (CCH) 412; T.C.M. (RIA) 61091; March 31, 1961
*246 Richard G. Hahn, Esq., Security Bldg., Pasadena, California., for the petitioners. Michael P. McLeod, Esq. for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency in the petitioners' income tax for the year ended December 31, 1955, in the amount of $14,690.11. The issues for determination are: (1) Whether petitioner was engaged in the trade or business of promoting, organizing, forming, managing and financing business enterprises; and (2) If he was, whether certain losses were incurred by petitioner in such trade or business. Findings of Fact Most of the facts have been stipulated and are hereby found as stipulated. Lynn A. Smith (hereinafter referred to as Smith) and Mary McK. Smith are husband and wife. For the year 1955, petitioners filed a joint return with the district director of internal revenue, Los Angeles, California. Since Mary McK. Smith is joined only by reason of having filed a joint return, Smith will sometimes be referred to hereinafter as petitioner. Petitioner received a degree in chemistry from Yale in 1924. In 1924, he began working for Lee S. Smith & Son Manufacturing Company *247 (hereinafter referred to as Smith Manufacturing) as a chemist. After the death of his father in 1925 and the death of his grandfather in 1926, petitioner ceased to be actively engaged as a chemist. Upon his graduation from college, petitioner also became associated with Lee S. Smith & Son Company (hereinafter referred to as the Smith Company), a dental supply company, which was organized and controlled by petitioner's family. Petitioner started as a member of the board of directors of the Smith Company and eventually became president of the company. Petitioner acquired the stock of the Smith Company by gift and inheritance from various members of his family. In 1928, the Smith Company was sold to S. S. White Dental Manufacturing Company at a profit. Smith Manufacturing was a manufacturing organization as contrasted with the Smith Company which was a sales organization. Petitioner's original stock in Smith Manufacturing was acquired by gift from his mother and he acquired other stock so that, at the time of the sale of the corporation, he owned 90 percent of all the stock. Petitioner eventually became president of Smith Manufacturing. In 1951, Smith Manufacturing was sold to Wallace *248 A. Erickson Company. Both the Smith Company and Smith Manufacturing were organized by petitioner's grandfather. In 1939 or 1940, petitioner arranged for Smith Manufacturing to take over Kelly Burroughts Laboratory, Inc., (hereinafter referred to as Kelly Burroughs) which became a wholly-owned subsidiary of Smith Manufacturing. After the acquisition, petitioner became the president of Kelly Burroughs. In 1951, Kelly Burroughts was sold with Smith Manufacturing to Wallace A. Erickson Company. Petitioner purchased formulae and trademarks from David Curtiss, and put them together in a new business called Anestex Laboratories (hereinafter called Anestex), which was first operated as a sole proprietorship, and later incorporated by petitioner. Petitioner became the president of Anestex after its incorporation, In 1951, Anestex was sold to Wallace A. Erickson Company. In 1945 or 1946, petitioner started a retail dental business known as Pittsburgh Dental Depot, which he subsequently incorporated and which was thereafter known as Pittsburgh Dental Depot, Inc. (hereinafter referred to as Pittsburgh Dental). Shortly after the sale of Smith Manufacturing, petitioner sold Pittsburgh Dental *249 to L. D. Caulk Company in 1952. Sometime in 1924, petitioner became a director of Oral Hygiene, Inc., (hereinafter referred to as Oral Hygiene) and since that time has been treasurer and a director. Oral Hygiene, a corporation formed by petitioner's father, has two subsidiaries, Oral Hygiene International, Inc., (hereinafter referred to as Oral International) and Dental Digest, Inc., (hereinafter referred to as Dental Digest). Petitioner was one of the organizers of Oral International, while Dental Digest was purchased from Dentist's Supply Company of New York in 1932. Oral Hygiene was sold by petitioner on behalf of himself and the other owners in 1957. In 1927, petitioner formed a chemical consulting company called Industrial Research & Engineering Company (hereinafter referred to as Industrial Research). In 1956, this company was liquidated. In 1952, petitioner organized Picco, Inc., (hereinafter referred to as Picco), a corporation in the business of precision casting known as "Investment Castings", which is the same process as is used for making dental restorations. Petitioner is the president and sole stockholder of Picco. Petitioner started a powdered metal division of *250 Picco, and Picco acquired all the stock of Bronz-Aloy Corporation (hereinafter referred to as Bronz-Aloy) which was in the powdered metal business and had equipment which Picco needed. Petitioner became the president of Bronz-Aloy. Procurement Laboratories, Inc., (hereinafter referred to as Procurement Labs) was a corporation organized under the laws of California in 1952. Petitioner was treasurer of Procurement Labs from February 19, 1953, until the corporation ceased business in 1955; however, petitioner was not a stockholder in this company. Petitioner became interested in Procurement Labs because, in addition to its plastics business it made investment castings of the type made by Picco. Over a period commencing October 17, 1952, petitioner advanced to Procurement Labs, in varying amounts, a total of $38,000, and guaranteed its notes to the Southern Commercial and Savings Bank in the amount of $23,187.74, including principal and interest. During the calendar year 1955, Procurement Labs was taken over by its creditors and petitioner paid the sum of $23,187.74 to the Southern Commercial and Savings Bank pursuant to his guarantees. Petitioner has never recovered any of the $38,000 *251 directly advanced to Procurement Labs, nor any of the $23,187.74 paid as endorser of the company's notes. Procurement Labs had no assets from which to recover anything after paying secured creditors. On his Federal income tax return for the year 1955, petitioner deducted $61,187.74 as a business bad debt which was disallowed by respondent. In addition to the loans petitioner made to Procurement Labs, he has loaned funds to and guaranteed paper of Smith Manufacturing, Oral Hygiene, Kelly Burroughs, Anestex, Picco, and Industrial Research. On his Federal income tax return for 1955, petitioner deducted $61,187.74 as a business bad debt. Respondent, in his notice of deficiency, disallowed the loss because he determined that the loss was not a business bad debt under the provisions of section 166 [1] of the Internal Revenue Code of 1954. *252 Opinion The question for decision is whether petitioner sustained the loss in a trade or business. It is petitioner's contention that he was engaged in the business of organizing, promoting, investing in, managing, and financing of business enterprises. Petitioner has relied on Vincent C. Campbell, 11 T.C. 510 (1948), Henry E. Sage, 15 T.C. 299 (1950), and Giblin v. Commissioner, 227 F. 2d 692 (C.A. 5, 1955), to support his position. Petitioner contends that all his business time was spent dealing with his various enterprises and points out that he advanced funds and guaranteed paper for 7 of the 12 enterprises with which he was connected. We are unable to agree with petitioner's contention. The only evidence presented by petitioner was that he individually organized several corporations and through controlled corporations organized two more. He testified that he had made and guaranteed loans to 7 of the 12 corporations with which he was connected. Petitioner fails to recognize the distinction between carrying on one's business through a corporate form, which, of course, necessarily requires organizing and financing, and the business of *253 dealing in corporations, which may likewise require some financing arrangements. Under the former situation, the corporate entity is the primary debtor, and loans by a stockholder to protect his investment or increase its value do not create a separate business for the stockholders. Holtz v. Commissioner, 256 F. 2d 865, 870 (C.A. 9, 1958). Vincent C. Campbell, Henry E. Sage, and Giblin v. Commissioner, all supra, are distinguishable from the instant case. In each of those cases, the facts showed that the individuals spent a substantial part of their time dealing in various ventures. In the case before us, there is no such evidence. The holding of those cases is applicable only to situations where the taxpayer's activities in promoting, financing, managing, and making loans to a number of corporations are so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves. Charles G. Berwind, 20 T.C. 808 (1953), affd. 211 F. 2d 575 (C.A. 3, 1954). The fact that petitioner organized several corporations and loaned them money does not per se put him in the business of promoting, organizing, *254 forming, managing and financing business enterprises. Petitioner has failed to carry his burden of proof in showing that he was engaged in the business of dealing in corporations. Accordingly, we have found as a fact, and so hold, that petitioner was not so engaged in 1955. Decision will be entered for the respondent. Footnotes
1. SEC. 166 BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a taxpayer's trade or business; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩